NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10784


COMMONWEALTH  vs.  SHAWN LESSIEUR.



     Middlesex.     April 10, 2015. - July 27, 2015.

  Present:  Gants, C.J., Botsford, Duffly, Lenk, & Hines, JJ.


Homicide.  Evidence, Prior consistent statement, Impeachment of
     credibility, Corroborative evidence, Exculpatory.  Witness,
     Impeachment, Corroboration.  Practice, Criminal, Capital
     case, Assistance of counsel, Argument by prosecutor.




     Indictments found and returned in the Superior Court
Department on May 8, 2008.

     The cases were tried before S. Jane Haggerty, J., and a
motion for a new trial, filed on May 2, 2011, was heard by her.


     Leslie W. O'Brien for the defendant.
     Crystal Lee Lyons, Assistant District Attorney, for the
Commonwealth.


     HINES, J.  On March 17, 1994, Mark Jones was shot twice in

the head and died from his injuries.  In April, 2006, Nolyn

Surprenant (Surprenant) implicated himself and the defendant in

the murder.  Surprenant was indicted for murder two months

later.  In March, 2007, Surprenant made an agreement with the

Commonwealth to testify against the defendant in exchange for a recommendation of five years in State prison on a manslaughter charge. The defendant was subsequently indicted and, following a jury trial in the Superior Court, was convicted in October, 2009, of murder in the first degree on the theory of deliberate premeditation and also of unlawful possession of a firearm.[1] On May 2, 2011, the defendant filed a motion for a new trial under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), which was denied. The appeal from the denial of the motion was consolidated with the defendant's direct appeal.

Represented by new counsel on appeal, the defendant challenges: (1) the admission of multiple prior consistent statements; (2) the effectiveness of trial counsel in failing to object to the admission of certain evidence and failing to impeach a witness; (3) the prosecutor's closing argument; and (4) the viability of the conviction based on uncorroborated testimony and newly discovered evidence. We affirm the defendant's convictions and the denial of his motion for a new trial, and discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

---

[1] The judge imposed a mandatory sentence of life without the possibility of parole in State prison on the defendant's murder conviction and a concurrent sentence of from four to five years in State prison for the unlawful possession of a firearm conviction.

Background.  We recite the facts the jury could have found based on the Commonwealth's case.  The defendant and Surprenant first met in 1989, when the defendant moved into the foster home where Surprenant, then fourteen years of age, lived.  The two became very close and Surprenant began selling drugs for the defendant two or three years later.  Surprenant dropped out of high school and moved out of the foster home and into the apartment that the defendant shared with his girl friend, Stacy Cruz.  The three spent a lot of time in the Chelmsford Street Projects in Lowell, and a group of people gathered at a house nearby, owned by Carol Ayotte, to sell, buy, and consume drugs.

The defendant and Surprenant both knew the victim, although the victim was part of a different social group.  The victim had a reputation for violence and threatened to rob the defendant about two weeks before the murder.  The victim was murdered on March 17, 1994.

Mark Beaulieu, then a resident of the University Heights apartment complex off Skyline Drive in Lowell, witnessed some of the events that occurred at the scene that evening.  He was outside of his apartment with his wife at about 6:55 P.M, clearing snow off their vehicle.  He noticed a vehicle parked with the engine running near the dumpster area of the complex and someone in the driver's seat.  He heard two gunshots fired a few seconds apart, which brought his attention back to the

dumpster area. Beaulieu saw someone come out from the side of the building near the dumpster and get into the passenger seat of the vehicle. He approximated that, based on the roof line of the vehicle, the passenger was "no taller than six feet" and had shorter hair, but was not able to describe any other details of the driver or passenger. The vehicle then turned to leave the apartment complex.

Beaulieu and his wife got into their vehicle and followed the departing vehicle. He could not get a clear view of the license plate, but described the vehicle as "Toyotaish, . . . Japanese make older boxy." Beaulieu eventually turned around and returned to the apartment to call the police.

The victim was found in the early morning hours of March 18, 1994, lying face up in the dumpster area of University Heights. He was fully clothed, except that his penis was outside of his pants. The first officers dispatched, at 7:16 P.M. on March 17, did not find the victim's body because the area was very dark and covered in deep snow. After a second dispatch, emergency medical technicians arrived shortly after midnight and located the victim. The victim had been shot once on the left cheek and once on the back left side of his head near his neck. Either shot would have killed him, and he likely died in seconds.

Police officers interviewed fifty to one hundred people during their investigation, but did not establish any concrete leads. They did not talk to Surprenant during their initial investigation.

Twelve years after the murder, in April, 2006, two police officers went to the house that Surprenant shared with his pregnant wife to talk to him. The police officers asked Surprenant if he would come with them to talk, which he understood to be in regard to the death of the victim. Surprenant asked if he would be coming home that night, and the officers said that he would. The officers drove him to Skyline Drive, where he described the victim's murder to them. Surprenant told the officers that on the evening of the murder, the defendant called Surprenant at the apartment they shared at about 6 P.M. and asked him to retrieve a gun from a reclining chair in the defendant's bedroom. The defendant explained that the victim was with him at the Chelmsford Street Projects. Surprenant eventually found the gun and took it to Ayotte's house. He drove the defendant's blue Toyota Corolla automobile.

The defendant met Surprenant outside Ayotte's house. The defendant explained to Surprenant that he and the victim would get into the vehicle with Surprenant and expounded, "I told [the

victim] I was going to take him to my dealers."[2]  The victim sat in the back seat of the vehicle and the defendant sat in the passenger seat.  The victim thought they were going to the defendant's drug dealer to rob him.  The defendant asked Surprenant to stop at a convenience store.  During this stop, Surprenant gave the defendant the gun while the victim was not looking.

The three got back into the same seats in the vehicle and, following the defendant's directions, Surprenant drove to University Heights.  The defendant asked Surprenant to park next to the dumpster and got out of the vehicle, stating that he was going to "take a piss."  The victim said he would go with the defendant.  Surprenant stayed in the driver's seat and turned the vehicle's lights off; he left the engine running.

The defendant and the victim walked toward the side of the building.  About three to four minutes later, Surprenant heard two gunshots fired about three to five seconds apart.  About thirty seconds later, the defendant came back to the car alone and Surprenant drove out of the apartment complex.  The

---

[2] Stacy Cruz testified in response to the Commonwealth's subpoena.  She attempted to give the defendant an alibi on the night of the murder, saying that she did not think the defendant left Ayotte's house because he did not give her any drugs to sell and he always did so before leaving.  She said she left Ayotte's house the night of the murder with Surprenant and the defendant.  The jury apparently did not find her testimony credible.

defendant said that he "shot [the victim] while we was taking a piss while he had his dick in his hand."  The defendant said he shot the victim in the head and the face, but that he wanted to go back and make sure the victim was dead.  The two drove to their former foster home, where they stayed for approximately five minutes before Surprenant recommended that they go to the Tyngsboro bridge and dispose of the gun.  Surprenant parked near the bridge and the defendant walked up and threw the gun off the side.  Surprenant drove back to their apartment.

Surprenant continued to sell drugs for the defendant until August, 1994, when Surprenant was arrested for selling cocaine.  Although he and the defendant remained friends, the two never discussed the murder except for the first couple of weeks following the murder, when the defendant told Surprenant that he told a couple of people that he killed the victim.  Surprenant told his former girl friend, Kristin Tatro, about the murder in 1996 or 1997, and told his brother, Jason, and a foster brother about the murder in 1999.  Jason told Surprenant never to tell anyone else about what had happened or else he would be "locked up for the case."

In addition to the statement Surprenant made in the police cruiser, he made a video recorded statement that night at the Lowell police station.  He also led the police to the Tyngsboro bridge, where the two had disposed of the gun, and the police

then took him home.  The following month, a warrant issued for Surprenant's arrest, and Surprenant turned himself in. Surprenant's attorney negotiated a deal whereby Surprenant would testify against the defendant in exchange for five years in State prison on a manslaughter charge.  Surprenant remained in custody from May, 2006, through trial.

The defense vigorously cross-examined Surprenant regarding recent contrivance, motive to lie, and bias, highlighting the terms of the deal that Surprenant made with the prosecution and suggesting that he contrived the testimony in an attempt to keep himself out of trouble.  Defense counsel also impeached Surprenant with inconsistencies in his testimony at trial, his testimony before the grand jury, his video recorded statement, and the police report written after Surprenant's statements on Skyline Drive and at the police station; a possible third-party culprit, "Minolo"; and memory issues, questioning Surprenant about his drug use at the time of the murder and a prior head injury.  In response to impeachment for recent contrivance, the Commonwealth presented Surprenant's prior consistent statements through the testimony of Tatro, Jason, and Sergeant Joseph

Murray, a police officer who conducted the April, 2006, interviews.[3]

Tatro testified that she met Surprenant in 1993, had two children with him in 1995 and 1997, and that their relationship ended in 1998 or 1999. She said that Surprenant told her about the murder sometime during their relationship. He told her that he and the defendant picked up the victim because the victim had been talking about robbing the defendant, and that the defendant shot the victim. Tatro testified that police had asked her about the murder in 2005, but that she lied and told the police that she had no information because she was afraid and loyal to Surprenant.

Jason testified that Surprenant told him about the murder during the summer of 1999. Jason was out on parole during that period, having been incarcerated in 1994. Surprenant told Jason that he was in the vehicle when the defendant shot the victim in the back of the ear and in the head. Surprenant also told Jason that he had an affair with Cruz in 1999, when she and the defendant were still in a relationship.

---

[3] The Commonwealth also sought to introduce the videotape of the statement that Nolyn Surprenant (Surprenant) made at the police station. Although the judge was inclined to allow the videotape, after vigorous objection by the defendant, she excluded the tape as being more prejudicial than probative. She instead suggested that Sergeant Joseph Murray testify about the statement.

Sergeant Murray recounted Surprenant's prior statements during the interview on Skyline Drive and then at the police station. He noted that there were no promises made to Surprenant before Surprenant started giving information about the crime. Sergeant Murray said that police officers only told Surprenant that he would be going home that night after Surprenant agreed to get into the cruiser with them. After Surprenant recounted the murder, he asked again if he was going home that night and the officers said that they would have to make a few telephone calls at the police station, but he was allowed to return home.

The defense strategy was to show that Surprenant himself was the shooter or that he participated in the crime with a third party. The defense called two witnesses, Jamie Simard and Stephen Andrade.[4] Simard testified that Surprenant told him, in 1996 or 1997, that he drove the victim and "Minolo"[5] to Skyline Drive and that Minolo shot the victim. Andrade testified that Surprenant threatened him, in 1995, because Andrade owed him money for drugs. Surprenant told Andrade that he had "one body

_____

[4] Jamie Simard was incarcerated with the defendant in March, 2009. After seeing the defendant there, Simard decided to come forward with what he knew. Stephen Andrade called the defendant's attorney approximately one month before trial to report what he knew.

[5] Simard described Minolo as a Hispanic male from the Chelmsford Street Projects, about 5'4" to 5'5" tall, and thin.

under his belt" and "You think I'm kidding?  You see [the victim], you see what happened to him."  Surprenant then showed him a gun.

Discussion.  The primary issue at trial was whether the defendant was the person who committed the murder; the Commonwealth relied on Surprenant's testimony to tie the defendant to the murder.  In this appeal, the defendant does not contest the sufficiency of the evidence at trial but rather presents a series of arguments that attack the credibility of Surprenant's testimony.  Because the defendant's appeal from the denial of his motion for a new trial has been consolidated with his direct appeal, we review both pursuant to G. L. c. 278, § 33E.  Commonwealth v. McGee, 467 Mass. 141, 145 (2014), citing Commonwealth v. Mercado, 466 Mass. 141, 145 (2013).

1.  Prior consistent statements.  The defendant argues that the judge erred in allowing three witnesses to convey to the jury Surprenant's prior consistent statements that the defendant killed the victim.  As there was no objection to this testimony, we review the defendant's claim to determine whether the testimony was erroneously admitted, and if so, whether the error created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Rivera, 430 Mass. 91, 99 (1999).  We conclude that the admission of the statements was not error for the reasons explained below.

Prior consistent statements are "generally inadmissible to corroborate in-court testimony or a witness's credibility, but they are admissible when offered in response to a claim of bias, inducement, or recent contrivance." Commonwealth v. Saarela, 376 Mass. 720, 722 (1978), citing Commonwealth v. Zukoski, 370 Mass. 23, 26-27 (1976). See Mass. G. Evid. § 613 (b) (2015). Prior consistent statements are only admissible to rebut the claims of recent contrivance but not to prove the truth of the statement challenged at trial. Commonwealth v. Wright, 444 Mass. 576, 582 (2005), citing Commonwealth v. Martinez, 425 Mass. 382, 396 (1997). "[T]he admission or exclusion of such testimony rests largely in the discretion of the trial [judge]." Commonwealth v. Tucker, 189 Mass. 457, 485 (1905). The judge allowed the prior consistent statements because the defense raised a claim of recent contrivance, and she gave limiting instructions requested by the defense.[6]

---

[6] Defense counsel requested that the judge instruct the jury that the testimony of Kristin Tatro and Jason Surprenant (Jason) was limited to the question of Surprenant's credibility. The judge gave a more specific form of the requested limiting instruction prior to the testimony of these two witnesses. Additionally, in the final jury instructions, the judge instructed the jury that all prior consistent statements are "admitted into evidence solely on your consideration in evaluating the credibility issue of a witness and to rebut any suggestion that the trial testimony is a result of recent contrivance or fabrication." Accordingly, the instructions satisfied the requirement in Commonwealth v. Rivera, 430 Mass.

The defendant first argues that the exception allowing prior consistent statements is not applicable in his case because the prior statements were not relevant to rebut a recent contrivance; instead, the statements were self-serving even before Surprenant made a deal with the Commonwealth. We disagree.

Years before the police spoke with Surprenant about the victim's death, he confessed to his girl friend and brother that he participated in the murder. Further, he confessed to the police that he participated in the murder before he received any promises of leniency or negotiated a deal. As Surprenant could be subject to criminal liability regardless of whether he or the defendant pulled the trigger, we cannot say that his confessions identifying the defendant as the shooter were self-serving.[7] See Commonwealth v. Britt, 465 Mass. 87, 97 (2013) (discussing joint venture liability where participant knows joint venturer has weapon). See also Rivera, 430 Mass. at 100 (rejecting defendant's argument that witness's confession to participation in murder before reaching deal with police was self-serving).

_____

91, 100 (1999) that the jury be given a limiting instruction on the defendant's request.

[7] Although the defendant maintains that Surprenant's story was fabricated, he acknowledges that the story "did not exonerate [Surprenant], and was instead a confession to first-degree murder."

Defense counsel claimed recent contrivance through Surprenant's cross-examination.  He asked Surprenant whether anyone prevented him from giving a statement to police prior to being interviewed, and then in the next question asked whether it was correct that, "for your participation in the murder of [the victim], you're getting five years."  He also asked whether the officers promised not to arrest him the night of the initial statement.  Moreover, counsel claimed recent contrivance strenuously during closing, stating for example that Surprenant's "memory gets better as he keeps talking to the government and gains . . . information."  Given this context, the judge did not err in admitting the statements to rebut the defendant's claims of recent contrivance.

The defendant next argues that allowing three witnesses to each recite Surprenant's prior consistent statements was improper bolstering of Surprenant's testimony and thus exceeded the bounds of the exception allowing admission of prior consistent statements.  Although the better practice is to scrupulously avoid improper bolstering, we discern no error in the circumstances of this case.  The defendant analogizes to the first complaint doctrine, under which the admissibility of witness testimony relaying out-of-court statements by a sexual assault complainant is limited to the "first" complaint. Commonwealth v. King, 445 Mass. 217, 245 (2005), cert. denied,

546 U.S. 1216 (2006). The first complaint doctrine permits the Commonwealth to introduce an out-of-court statement made by a victim after an alleged sexual assault for the purpose of corroborating the victim's own in-court testimony. Id. Prior to King, judges were encouraged, but not required, to restrict the number of complaint witnesses, id. at 232, citing Commonwealth v. Licata, 412 Mass. 654, 659-660 (1992); in King, we limited the statements allowable under the doctrine to only the first[8] complaint, after taking into account "prejudicial 'piling on' of such witnesses." Id. at 245. We reasoned that "[t]he testimony of multiple complaint witnesses likely serves no additional corroborative purpose, and may unfairly enhance a complainant's credibility . . . ." Id. at 243.

The defendant's analogy, while germane to the dangers of cumulative testimony, is not determinative in this case. The first complaint doctrine allows admission of an out-of-court statement for corroboration alone without any inference of recent contrivance.[9] See Mass. G. Evid. § 413 (a) (2015). If an

---

[8] In certain circumstances, a substitute witness may testify in place of the first complaint witness and the complainant may also testify as to the details of the first complaint. Commonwealth v. King, 445 Mass. 217, 243-244, 245 & n.24 (2005), cert. denied, 546 U.S. 1216 (2006).

[9] The first complaint doctrine is also not determinative here, of course, because the doctrine is only applicable to a

out-of-court statement rebuts a claim of recent contrivance, however, it may be admitted in addition to testimony allowed under the first complaint doctrine. See Mass. G. Evid. § 413 (b) (multiple complaints serving evidentiary purpose other than corroboration allowed if probative value outweighs prejudicial effect); Commonwealth v. Dargon, 457 Mass. 387, 400 (2010), quoting Commonwealth v. Arana, 453 Mass. 214, 229 (2009) (if subsequent complaint evidence "does serve a purpose separate and apart from the first complaint doctrine, the judge may admit it 'after careful balancing of the testimony's probative and prejudicial value'"). Cf. Commonwealth v. Parent, 465 Mass. 395, 404 (2013) (claim of fabrication insufficient to allow admission of multiple complaints). Consequently, multiple accounts of a prior consistent statement may be admitted even if the limitations prescribed by the first complaint doctrine applied here.

We recognize the danger in admitting cumulative accounts of prior consistent statements because, as we previously stated, "corroborative evidence . . . can have, at most, only a very indirect bearing upon the credibility of the witness, while from its very nature it may be likely to influence the jury as substantive evidence of its own truthfulness." Tucker, 189

certain class of sexual assault cases not at issue. King, supra at 247.

Mass. at 484. Multiple accounts of the same evidence may, however, serve evidentiary purposes apart from corroborating the witness's testimony. See Commonwealth v. Kebreau, 454 Mass. 287, 298-299 (2009) (multiple accounts of prior consistent statement admissible following claim that witness fabricated sexual abuse claim in order to obtain restraining order). That is the case here, where the witnesses' testimony was relevant to rebut various claims of recent contrivance. Surprenant's pre-2006 statements to Tatro and Jason were relevant to rebut defense counsel's claim that the officers told Surprenant what to say when they questioned him in April, 2006, and that he was induced to fabricate his story by the "promises" that he would not be arrested and that he would return home the night of questioning. In contrast, Sergeant Murray's testimony was relevant to rebut recent contrivance claims that derived from inconsistencies in various accounts of Surprenant's statements. In light of these circumstances, the judge did not err in allowing the various accounts. See Rivera, 430 Mass. at 100.

2. Ineffective assistance of counsel. Because we review the defendant's claims of ineffective assistance of counsel under G. L. c. 278, § 33E, we "determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than is the general constitutional standard for

determining ineffective assistance of counsel."  Commonwealth v.
Frank, 433 Mass. 185, 187 (2001).  See Commonwealth v. Wright,
411 Mass. 678, 682 (1992).  We "consider whether there was an
error in the course of the trial (by defense counsel, the
prosecutor, or the judge) and, if there was, whether that error
was likely to have influenced the jury's conclusion."  Id.

The defendant argues that trial counsel was ineffective for
(a) failing to object to the admission of Surprenant's prior
consistent statements and evidence of Cruz's age when her
relationship with the defendant began; and (b) failing to
impeach Surprenant's testimony with bias evidence and with a
prior conviction.  The defendant has failed to meet his burden
to prove ineffective assistance of counsel on any of his claims.
See Commonwealth v. Alcequiecz, 465 Mass. 557, 563 (2013).

First, trial counsel did not err by failing to object to
the asserted evidentiary errors because the pertinent evidence
was properly admissible.  See Kebreau, 454 Mass. at 301.  The
admissibility of the prior consistent statements is discussed
above.  Further, there was no error in the admission of Cruz's
age and therefore counsel was not ineffective for failing to
exclude this evidence.

The defendant raised his claim regarding Cruz's age in his
motion for a new trial.  At trial, the prosecution introduced
evidence that Cruz was fifteen years of age when her

relationship with the defendant, then twenty-one, began. The defendant stated in his affidavit filed with his motion that the only reason that evidence of Cruz's age was admitted was to demonstrate a prior bad act because he would be seen as "child abuser" if the jurors heard the ages of both him and Cruz without knowing that "[they] had an eight year relationship and two children together." The motion judge, who had been the trial judge, denied this claim after an evidentiary hearing. The judge noted that trial counsel could have masked this evidence through a motion in limine; however, the age gap would not have been completely eliminated because the Commonwealth was entitled to explore the depth of the relationship in order to demonstrate Cruz's bias. Without deciding whether counsel's failure to file a motion in limine was an error, the judge concluded that any such error would not have influenced the jury.

The judge properly resolved this issue against the defendant because Cruz's age was relevant, although perhaps not necessary, to demonstrate bias arising from her long-standing relationship with the defendant. Commonwealth v. Healy, 438 Mass. 672, 683 n.12 (2003). Further, trial counsel may have had a strategic reason for not taking any action to exclude Cruz's

age.[10] Cruz's age was used to demonstrate the length of the relationship for the jury. Cruz testified at the hearing on the motion for a new trial, in contrast, that the relationship ended after ten years, when the defendant was incarcerated on an unrelated charge. Because the Commonwealth was entitled to demonstrate the length of the relationship, trial counsel may have strategically decided not to seek exclusion of Cruz's age in order to minimize the risk of information regarding the defendant's prior incarceration coming before the jury. Therefore, we are unable to say on the record that trial counsel did not have a strategic reason for not excluding Cruz's age. Commonwealth v. Zinser, 446 Mass. 807, 811 (2006), quoting Commonwealth v. Adamides, 37 Mass. App. Ct. 339, 344 (1994) (claims of ineffective assistance may only be resolved on direct appeal if "factual basis of the claim appears indisputably on the trial record").

Second, trial counsel was not ineffective for failing to impeach Surprenant's testimony with bias evidence and with a prior conviction. The defendant raised his claim regarding bias evidence in his motion for new trial. Specifically, he argued

_____

[10] Trial counsel submitted an affidavit but did not testify at the hearing. Although counsel acknowledged discussing the issue with the defendant before trial, he did not provide any reason, tactical or otherwise, for not taking any action to exclude the evidence.

that trial counsel was ineffective for failing to impeach Surprenant's testimony with evidence of a short-term sexual affair between Surprenant and Cruz in 1998 or 1999 and a related conversation wherein Surprenant offered to kill the defendant for Cruz, while Cruz and the defendant were still in a relationship. Trial counsel stated in an affidavit submitted with the defendant's motion for a new trial that he was aware of the affair but made no mention whether he was aware that Surprenant, during the course of the affair, had asked Cruz if she wanted him to kill the defendant. He explained that he did not raise the subject of the prior affair because he was skeptical of the information.

The judge denied the defendant's claim because trial counsel's presentation of this information would not have influenced the jury's verdict where evidence of the affair was already before the jury through Jason's testimony and where so many years elapsed between the time of the alleged threat and when Surprenant identified the defendant to police in connection with the murder.[11] The defendant argues that the judge erred in denying his claim because evidence of the affair and threat

---

[11] The judge analyzed this evidence under the portion of her decision discussing newly discovered evidence, but her conclusions regarding the effect of the evidence are applicable to the defendant's ineffective assistance of counsel claims.

would have cast into doubt the inference that Surprenant was dominated by the defendant at the time of the murder, demonstrated bias, and provided an explanation for why Surprenant named the defendant as the "scapegoat" for the murder.

We agree with the judge that the claimed errors would not likely have influenced the jury's conclusion.  Wright, 411 Mass. at 682.  As noted by the judge, the jury were aware of the evidence of the sexual affair through another witness.  Further, the alleged affair and threat occurred four to five years after the murder, and therefore the assertion that the evidence would undermine the theory that Surprenant was under the defendant's control at the time of the murder rings hollow.[12]

The defendant also argues, for the first time, that trial counsel was ineffective for failing to impeach Surprenant with evidence of a prior assault and battery conviction.  A sidebar during trial demonstrates that trial counsel and the judge previously had discussed Surprenant's prior convictions; the

---

[12] There is no evidence, outside of the defendant's self-serving affidavit, that trial counsel knew of the threat before trial.  Even if trial counsel had been aware of the alleged threat, Cruz's affidavit stated that the threat followed on the heels of a fight between her and the defendant.  Without additional information, we can only speculate that trial counsel may have strategically decided not to raise the issue in order to prevent potential evidence of the defendant's aggressive behavior from being admitted.

defendant provided no information about the details of that conversation or any other information on which we could discern whether there was a strategic reason for not raising the prior conviction.[13]  Whether or not counsel had a strategic reason for not raising the prior conviction is not apparent on the record. Without additional information in this record, we cannot say that trial counsel's failure to raise the prior conviction was an error.  Alcequiecz, 465 Mass. at 562-563.

3. Prosecutor's closing argument.  The defendant argues that the prosecutor improperly vouched for Surprenant in his closing argument.  "Improper vouching can occur if an attorney expresses a personal belief in the credibility of a witness, or indicates that he or she has knowledge independent of the evidence before the jury."  Commonwealth v. Wilson, 427 Mass. 336, 352 (1998).  As there was no objection, we review the closing argument to determine whether there was improper prosecutorial vouching that created a substantial likelihood of a miscarriage of justice.  Commonwealth v. Rosario, 460 Mass. 181, 190 (2011), citing Wilson, supra at 354.

---

[13] As evidence of this alleged prior conviction is not in the record, we assume for the purposes of this decision that Surprenant actually was convicted of assault and battery.  We also note that other prior conviction evidence was admitted through testimony that Surprenant was previously "caught selling cocaine."

The defendant takes issue with three portions of the prosecutor's closing argument:  (1) the prosecutor's statement that the district attorney "gets involved in" determining how Surprenant's story fit with facts that could be proved and that there was no "rush" because the murder occurred twelve years prior; (2) that after officers spoke to Surprenant, the ongoing investigation "f[e]ll into place.  And that led to a renewal and that led to this trial"; and (3) "Why would [Surprenant] -- how could [Surprenant] make up, create -- you saw him, he's not -- Okay?"  The defendant argues that the prosecutor, through these statements, improperly expressed his personal belief in Surprenant's story.  The defendant's argument is unavailing because the prosecutor was merely referring to the Commonwealth's need to review details of the murder, which corroborated Surprenant's statement, before bringing any charges; was highlighting the lack of concrete leads in the case prior to the interview with Surprenant in response to defense counsel's suggestion that Surprenant contrived his statement to minimize his punishment; and was acknowledging the questionable parts of Surprenant's statement that indicated that Surprenant did not create a fabricated story.  The prosecutor did not improperly vouch for Surprenant's testimony.

4.  Other issues.  a.  Corroboration of participant testimony.  The defendant argues that the conviction, based on

Surprenant's uncorroborated testimony that the defendant committed the murder, violated his right to due process. There is no requirement that a cooperating witness's testimony be corroborated unless the witness is immunized under G. L. c. 233, § 20E, a factor not at issue here. Commonwealth v. Thomas, 439 Mass. 362, 372 (2003). In Thomas, supra at 372-373, we rejected a similar argument and noted that jury instructions and cross-examination protect a defendant's right to a fair trial. We discern no reason to revisit this rule.[14] The judge gave jury instructions regarding Surprenant's credibility in light of his cooperation with the Commonwealth and Surprenant's testimony was the subject of vigorous cross-examination. There was no violation of the defendant's due process rights.

b. Newly discovered evidence. The defendant argues that newly discovered evidence, specifically proffered testimony from Ricardo Rivera and Rivera's former girl friend, Christine Mungovan, would have been a real factor in the jury's deliberations and necessitates a new trial. "A defendant

_____

[14] Moreover, evaluating the evidence in the light most favorable to the Commonwealth, as we must, Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), Surprenant's testimony about the defendant's involvement in the murder was corroborated. Mark Beaulieu described the vehicle involved in the murder and the height of the shooter, both of which match the defendant's vehicle and the approximate height of the defendant. Cruz and another friend from the Chelmsford Street Projects both testified that the defendant and the victim were together earlier in the evening of the murder.

seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of the conviction." Commonwealth v. Santiago, 458 Mass. 405, 415 (2010), quoting Commonwealth v. Grace, 397 Mass. 303, 305 (1986). The evidence "must be material and credible . . . [and] must carry a measure of strength in support of the defendant's position. . . . Thus newly discovered evidence that is cumulative of evidence admitted at trial tends to carry less weight than new evidence that is different in kind." Santiago, supra, quoting Grace, supra at 305-306. Where "'the judge acting on the motion was also the trial judge' . . . and is in the best position to weigh the credibility of the proffered evidence and to determine its probable impact on a jury hearing it with all the other evidence," reversal of a motion for a new trial for abuse of discretion is particularly rare. Santiago, supra at 414, quoting Commonwealth v. Moore, 408 Mass. 117, 125 (1990).

The judge resolved the claims under the second prong of the newly discovered evidence test, whether the evidence "casts real doubt on the justice of the conviction," Commonwealth v. DiBenedetto, 458 Mass. 657, 664 (2011), quoting Grace, supra at 305, and whether "there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial." Id., quoting Grace, supra at 306. She

denied the motion after concluding that the jury would not have
reached a different conclusion with Rivera and Mungovan's
testimony.  Rivera submitted an affidavit and testified at an
evidentiary hearing on the motion, alleging that Surprenant told
him, in 1999 or 2000, that Surprenant killed the victim.
Mungovan also testified at the hearing, stating that Surprenant
told her that "he already had a body under his waist or under
his belt."  The judge did not credit either testimony, noting
their eighteen year friendships with the defendant and failure
to come forward previously with the information, even though
Rivera attended parts of the trial.  Nothing in the record
warrants disturbing the judge's conclusion.  The proffered
testimony was largely cumulative; the defense presented two
witnesses at trial who each relayed statements in which
Surprenant implicated himself in the murder between 1995 and
1997.[15]

The defendant argues that the judge abused her discretion
by basing her findings on her own credibility assessments
instead of weighing the risk that the new evidence would have

---

[15] The defendant also argues that proffered testimony that
Surprenant had guns in his apartment, five years after the
murder, would rebut the suggestion at trial that Surprenant was
an innocent and under the control of the defendant.  This
argument is unavailing because of the time lapse and because
Surprenant testified that he was a drug dealer at the time of
the murder.

influenced the jury's verdict.  This claim has no merit.  The judge properly relied on her knowledge of the trial in making her findings.  Moore, 408 Mass. at 127.

Because the judge did not err in resolving this claim under the second prong of the newly discovered evidence test, we do not consider the first prong of the test, where "[t]he defendant has the burden of proving that reasonable pretrial diligence would not have uncovered the evidence."  Grace, 397 Mass. at 306.

5.  Relief pursuant to G. L. c. 278, § 33E.  We have reviewed the entire record and see no reason to exercise our power to grant relief under G. L. c. 278, § 33E.

Judgments affirmed.

Order denying motion for a
    new trial affirmed.